IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2021

## STATE OF TENNESSEE v. ADAM DEWAYNE HOLMES

**Appeal from the Criminal Court for Knox County**
**No. 109529    Steven W. Sword, Judge**

_____

### No. E2021-00326-CCA-R3-CD

_____

The defendant, Adam Dewayne Holmes, appeals his Knox County Criminal Court jury convictions of facilitation of possession with intent to sell heroin, facilitation of possession with intent to deliver heroin, possession with intent to sell less than .5 grams of cocaine in a drug-free zone, possession with intent to deliver less than .5 grams of cocaine in a drug-free zone, and simple possession, arguing that the evidence was insufficient to support his convictions and that the trial court erred by denying his motion to suppress the results of what he alleges to be an unlawful vehicle search.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Susan Shipley, Knoxville, Tennessee (at trial and on appeal), and Brent Horst, Nashville, Tennessee (at motion hearing), for the appellant, Adam Dewayne Holmes.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant with one count each of possession with intent to sell less than 15 grams of heroin, a Schedule I controlled substance, in a drug-free zone; possession with intent to deliver less than 15 grams of heroin, a Schedule I controlled substance, in a drug-free zone; possession with intent to sell less than .5 grams of cocaine, a Schedule II controlled substance, in a drug-free zone; possession with intent to deliver less than .5 grams of cocaine, a Schedule II controlled substance, in a drug-free zone; possession of marijuana, a Schedule VI controlled

substance; accessory after the fact by harboring or concealing a felony offender; and driving on a revoked license. Before trial, the State dismissed the charge of driving on a revoked license.

At the November 2017 trial, Joel Asher, a maintenance superintendent for Knoxville's department of parks and recreation testified that Frajan Campbell Park was located at 1300 Moses Avenue in Knoxville and that the park contained "play structures . . . and a basketball court." He said that Frajan Campbell was a public park at the time of the offenses in this case.

Donna Roach worked for the Knoxville, Knox County, Knoxville Utilities Board Geographic Information System ("KGIS") and did "the computer mapping for Knox County." KGIS "can do digital data or actually cut maps and different type[s] of GO processing . . . for the city, county, KUB, engineers, excavators, architects, and various homeowners." Ms. Roach said that KGIS used aerial photography in generating maps and that the courts often use those maps "for visualization." She said that she was able to determine a distance between two points on a map and that the mapping system used by KGIS showed all of the parks in Knox County. She calculated the distance from the intersection of "West Fifth Avenue and James Avenue" to Frajan Campbell Park as 693 feet. She said that the margin of error for the calculation was "a foot for every hundred feet, which would be 10 feet within a thousand foot area."

During cross-examination, Ms. Roach acknowledged that Frajan Campbell Park was not visible from the intersection of West Fifth and James Avenues.

Zachary Akins, a criminal warrants officer with the Knox County Sheriff's Office ("KCSO"), testified that he routinely worked with federal officers in serving warrants. He said that in February 2016, he was working with the United States Marshals Service to locate Erreese King, a fugitive. A few weeks prior to the defendant's arrest, the officers went to the defendant's house in search of Mr. King. Officer Akins said that the officers told the defendant that they were looking for Mr. King and "explained to [him] that if he's caught harboring, aiding, and abetting or assisting the fugitive in any way he could be charged and prosecuted."

On February 5, 2016, Officer Akins, in coordination with the Marshals Service, "set up surveillance on a house off of . . . West Fifth." He received a report that Mr. King had gotten into "a red Dodge Charger, pulling out of the address there off West Fifth and turning onto James Street," one block from where Officer Akins was positioned. When Officer Akins saw the red Charger, he identified the person in the front passenger seat as Mr. King and initiated a traffic stop using "lights and sirens" and going "nose to nose" with the Charger. Officer Akins said that the Charger stopped in "the middle of the

street" and that he and other officers "removed the occupants of the vehicle," including Mr. King, the defendant, who had been driving, and a female passenger from the backseat. Although Mr. King was the target of the traffic stop, as a matter of policy, Officer Akins checked for outstanding warrants on the other two occupants and discovered that the defendant's driver's license had been revoked. He took the defendant into custody "for driving on a revoked [license] and, of course, for the aiding and abetting as well."

During cross-examination, Officer Akins testified that his vehicle was not equipped with a video recording device and that he did not wear a body camera. He acknowledged that he did not prepare a report on his initial encounter with the defendant prior to the February 5 incident. Officer Akins said that during that initial encounter, the defendant permitted the officers to enter his house and that the Marshals "did a majority of the talking." He said that, at the time of the defendant's arrest, the female occupant of the vehicle was not taken into custody and acknowledged that he did not record her name in his report. He also said that he called a narcotics agent to "verify the evidence found" during the search of the defendant's vehicle. A substance later identified as cocaine was recovered from under the front passenger seat of the Charger and approximately 14 pills were recovered from the backseat. Officer Akins said that he charged both the defendant and Mr. King in relation to the cocaine found under where Mr. King was seated.

KCSO Detective Jeff Neely testified as an expert in narcotics investigation. He said that he responded to the location where Officer Akins had stopped the defendant's vehicle. When he arrived, the vehicle had already been secured. He searched the vehicle and "found a bag underneath the front passenger seat that contained . . . approximately 22 grams of a substance believed to be crack cocaine." He identified the substance as cocaine based on "how it looked." He described the cocaine as being in multiple pieces within a single bag. He said that 22 grams of cocaine was a quantity more consistent with that purchased by dealers and not for personal use. "You're typically not found with 22 grams of cocaine if your intention is not to sell it." Detective Neely said that he found no evidence of drug use inside the vehicle or on the occupants. He explained that crack cocaine was typically sold in half-gram to one-gram portions and that dealers would "use the digital scales to make sure they're not giving too much." He said that he found an empty box for a digital scale in the "center console armrest." He also found "a box of sandwich bags commonly used to package narcotics and some different items that would be considered paraphernalia" in the trunk of the vehicle.

Detective Neely recovered "a bag of pills" from the backseat of the vehicle, which pills he identified as oxycodone by the use of a pill identifier application on his telephone. In the cupholder in the center console, he found "a small baggie" with 1.37 grams of marijuana. From the defendant's person, he recovered $1,975 in cash. He explained that "[i]t's common with -- people who are selling drugs [to] always have a

substantial amount of currency on them." Based on his professional experience, Detective Neely believed that the pills and cocaine were possessed for the purpose of resale and that the marijuana was possessed for the purpose of personal use.

Detective Neely testified that after he finished searching the Dodge Charger, the vehicle "was seized" by the KCSO, explaining that "[v]ehicles are seized during drug cases because they're used as a conveyance to . . . transport narcotics" and because "in general, [i]n the case of narcotics dealers, they're not employed," and if the vehicle was "purchased with drug funds, maintained with drug funds, or used to transport narcotics, we seize it." Vehicle records indicated that the Charger belonged to Emanuel Merriweather, but the defendant told the officers that he had recently purchased the car from Mr. Merriweather. Officers were unsuccessful in their attempts to contact Mr. Merriweather. Detective Neely said that he gave the defendant a "carbon copy" of the seizure form with information on reclaiming the vehicle and money that had been seized.

During cross-examination, Detective Neely clarified that all three occupants had been removed from the vehicle by the time he arrived to the scene and that the female occupant had already left, saying, "I showed up long after that part was over." He said that he did not photograph the items he collected from the vehicle because it was not part of his usual procedure. He said that another officer was "there with me inventorying the non-narcotic stuff" from the vehicle. He did not dispute that the other items in the trunk of the car included grocery items and acknowledged that it would not be unusual to find sandwich bags among grocery items.

Tennessee Bureau of Investigation Special Agent Carl Smith testified as an expert in forensic chemistry. In this case, he received "a rock-like substance, a plant material, and then tablets." He determined the rock-like substance to be cocaine base, a Schedule II controlled substance. He determined that the 14 tablets were illegally manufactured with markings that were consistent with oxycodone, but upon further analysis, he determined them to be heroin, a Schedule I controlled substance. He determined the plant-like material to be marijuana, a Schedule VI controlled substance.

The State rested, and, after a *Momon* colloquy, the defendant elected not to testify and put on no proof.

The jury found the defendant guilty of the lesser included offenses of facilitation of possession with intent to sell a Schedule I controlled substance and facilitation of possession with intent to deliver a Schedule I controlled substance in Counts 1 and 2, guilty as charged of possession with intent to sell less than .5 grams of a Schedule II controlled substance in a drug-free zone and possession with intent to deliver less than .5 grams of a Schedule II controlled substance in a drug-free zone in Counts 3 and 4, and

guilty of simple possession of a Schedule VI controlled substance in Count 5. The jury acquitted the defendant of the charge of accessory after the fact by harboring or concealing a felony offender in Count 6. After merging the appropriate convictions, the trial court imposed an effective sentence of eight years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant maintains that the evidence at trial was insufficient to support his convictions and that the trial court erred by denying his motion to suppress.

## I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence only as to the convictions related to the cocaine and heroin, arguing that the State failed to establish that he possessed the controlled substances.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant here, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4); *see also id.* § 39-17-406 (identifying heroin as a Schedule I controlled substance); *id.* § 39-17-408 (identifying cocaine as a Schedule II controlled substance). The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others." *Id.* (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419. A violation of Code section 39-17-417 "that occurs . . . within one thousand feet (1,000') of the real property that comprises a public . . . park shall

-5-

be punished one (1) classification higher than is provided in [section] 39-17-417(b)-(i) for such violation." *Id.* § 39-17-432(b)(1) (2014).

Moreover, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("[C]riminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). A person acts knowingly

> with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b).

Here, the evidence adduced at trial established that the defendant, who had been told that officers were looking for Mr. King, was driving in the area of West Fifth and James Avenues with Mr. King in the front passenger seat and an unidentified female in the backseat of his vehicle. Officer Akins effectuated a traffic stop to facilitate the arrest of Mr. King, and the defendant stopped his car in the middle of the road. Officer Akins asked all three occupants to exit the vehicle and determined that the defendant's driver's license had been revoked. Officer Akins arrested the defendant for driving on a revoked license and placed him in the back of a patrol vehicle. Officer Akins impounded the defendant's vehicle and arranged to have it towed away. Officers searched the vehicle to inventory its contents and discovered what was later identified as 22 grams of cocaine base under the front passenger seat, an amount much greater than what is typical for personal use, 14 heroin pills in a bag in the backseat, and 1.37 grams of marijuana in a front cupholder. Officers also recovered an empty box for a digital scale in the center console, a box of sandwich bags from the trunk, and $1,975 in cash from the defendant's person.

The defendant argues that the evidence was insufficient to establish that he possessed either the heroin or the cocaine. As to the heroin-related convictions, the defendant was convicted of facilitation of the offenses. To be found guilty of these offenses, the jury had to find that the defendant "knowingly furnishe[d] substantial assistance" to someone else's possessing the heroin pills with the intent to sell or deliver them and not that the defendant had actual or constructive possession of the pills himself. Similarly, as to the cocaine-related convictions, the jury was instructed on the theory of criminal responsibility. To convict the defendant under the theory of criminal responsibility, the jury had to find that the defendant "inten[ded] to promote or assist" another's possession of cocaine with the intent to sell or distribute by "aid[ing], or attempt[ing] to aid another person to commit the offense." Moreover, a person may be found to be in constructive possession of an illegal substance that is found in the car in which he is an occupant. *Peters v. State*, 521 S.W.2d 233, 235 (Tenn. Crim. App. 1974) (stating that "possession means control" and holding that all three occupants of a vehicle "were in control of the drugs" that were discovered underneath the passenger seat and in the back of a van).

The evidence adduced at trial was sufficient to support the defendant's convictions for facilitation of possession of heroin with the intent to sell or distribute it. A bag of 14 heroin tablets, designed to look like oxycodone pills, were found on the backseat of the defendant's vehicle near where the unidentified female passenger was seated. The female passenger's close proximity to the bag of heroin and the quantity of the drug in the bag supported the jury's finding that the female passenger possessed the heroin with the intent to sell or distribute it. *See State v. Gibson*, 506 S.W.3d 450, 459-60 (Tenn. 2016) (defendant's sitting on a chair next to a duffel bag containing drugs supported a finding that he constructively possessed the drugs); *Peters*, 521 S.W.2d at 235. Moreover, the presence of the box for a digital scale and sandwich bags, which items Detective Neely testified were commonly associated with drug dealing, further supported the finding that the drugs in the vehicle were possessed for the purpose of resale. *See State v. Nash*, 104 S.W.3d 495, 500 (Tenn. 2003) ("[G]iven the large quantity of marijuana along with the drug paraphernalia, it was reasonable to find that [the driver] possessed the marijuana with the intent to sell or deliver."). The jury was free to infer that the defendant knew of the female passenger's possession of the heroin and to conclude that he provided substantial assistance to her by driving her around.

Likewise, the evidence was sufficient to establish that the defendant, as the owner and driver of the car, constructively possessed the cocaine found under the front passenger's seat. *Peters*, 521 S.W.2d at 235. Moreover, the quantity of the drug, the presence of a box for a digital scale and sandwich bags, and the defendant's having $1,975 in cash on him supported the finding that he possessed the cocaine with the intent to sell or distribute it. *See Nash*, 104 S.W.3d at 500. This evidence was also sufficient to support a

-7-

conviction on the theory of criminal responsibility. The jury could have concluded that Mr. King possessed the cocaine with the intent to sell or distribute it and that the defendant intended to promote or assist Mr. King's commission of the offense by driving him around and by holding the cash used in the drug transactions.

## II. Motion to Suppress

Before trial, the defendant moved the trial court to suppress all evidence obtained from the search of his vehicle, arguing that "the stop and search of the vehicle was conducted without probable cause or reasonable suspicion and without other lawful authority." The State argued that the traffic stop was lawful and that the search of the vehicle was performed incident to the defendant's arrest or as a valid inventory search upon impoundment of the vehicle. The trial court held a hearing on the motion on June 9, 2017.

At the motion hearing, Officer Akins testified that, at the time of the offenses in this case, he was assigned to the U.S. Marshal-led Smoky Mountain Fugitive Task Force, in which he assisted in "[a]pprehending violent fugitives, gang members, and people with . . . felony drug charges, so on, so forth." He said that the task force was looking for Erreese King, who was wanted by the U.S. Marshal Service. Although the defendant was not a subject of that investigation, the defendant's address was associated with Mr. King. Officer Akins said that he was present "a week or two" before February 5, when he and other officers went to the defendant's house and that the other officers warned the defendant about "harboring a fugitive, aiding and abetting" and that if the defendant was "caught . . . helping, aiding [Mr. King] in any way, he could be subject to prosecution." On February 5, Officer Akins saw Mr. King riding in the passenger's seat of the defendant's vehicle in the area of "Boyd and James Street." Officer Akins effectuated a traffic stop "in the middle of the street," "detained" the three occupants, and checked their identifications for outstanding warrants and driver's license statuses. The defendant had been driving the vehicle, and a check of his driver's license revealed that his license had been revoked. At that point, Officer Akins "[p]laced him into custody for driving on [a] revoked license." Mr. King was taken into custody for outstanding warrants. The female passenger who had been riding in the backseat had a "discrepancy with her license too," although Officer Akins could not recall the specific issue.

Determining that none of the three occupants could drive the vehicle, Officer Akins determined that the vehicle "was going to be towed." He said that the vehicle was inventoried to prepare it for towing and that the inventory search revealed "crack cocaine and OxyContin," but he could not remember where in the vehicle the drugs were found. He also said that "a misdemeanor amount of marijuana" was also found. The vehicle was then towed from the scene.

-8-

During cross-examination, Officer Akins acknowledged that he had never seen Mr. King other than in pictures. He said that he identified Mr. King as the front seat passenger in the vehicle from approximately 150 yards away. He said that he "was pretty positive" at the time that the man he saw was Mr. King. Officer Akins said that he determined "10 to 15 minutes or so" after the initial stop that the defendant's driver's license was revoked and that he immediately took the defendant into custody and placed him in his patrol vehicle. Officer Akins said that, other than the three occupants of the vehicle, no civilians were present. He said that he learned "later on" that the defendant had just driven away from his sister's house that was very nearby where Officer Akins stopped the car. Officer Akins said that he did not remember discussing with the defendant what to do with the car but acknowledged that such a conversation "[c]ould have" happened. He said that he did not personally search the vehicle but that he was familiar with the KCSO's vehicle inventory procedures.

On redirect examination, Officer Akins testified that under the KCSO's policy, it was up to the officer's discretion whether to have a vehicle towed or to allow someone to drive it away from the scene. He said that, to his knowledge, no one asked to take the vehicle from the scene in this case.

The defendant testified that when he was stopped by Officer Akins, he "had just pulled up at my sister['s] driveway." He estimated that his vehicle was less than 42 feet away from his sister's house. He said that while he was seated in the police vehicle, "My mama was out there" and that he asked an officer, "[C]an you give my keys and phone to my mama?" He said that his mother was at the scene because he had "called her 'cause I was telling them that I stay right across the street." He explained that he wanted his mother to take possession of his "stuff," including his car. He said that shortly before he was taken from the scene, his wife also arrived.

During cross-examination, the defendant said that he owned the car. He said that he had been at his sister's house and was stopped immediately after leaving her driveway. He said that Mr. King and a female acquaintance of Mr. King were in the car with him. The defendant denied that Officer Akins had previously talked to him about their searching for Mr. King but acknowledged that a U.S. Marshal had told him that "they were doing the search." He said that the Marshal told him, "'If I see you with Mr. King . . . I'm going to charge you with harboring a fugitive[.]'" He reiterated that his mother came to the scene because he called her to "personally . . . tell her I was getting locked up." He also said that he "told the officer, yes, I want my mom to come get my car 'cause I dropped my kids off. School was just letting out." He said that an officer had possession of his cellular telephone and that he wanted his mother to take possession of his car and his telephone.

Lydia Darlene Holmes, the defendant's mother, testified that the day of the defendant's arrest, she "had just got off from work and my daughter lives . . . not too far from where it was at." She said that she came to the scene because "I was already coming down because I'm nosey." She said that her daughter's house was not far from where the defendant was arrested and that "[y]ou could see everything" from the house. When she arrived on the scene, the defendant "was in a car." She said that she attempted to ask the officers what was going on but that "they wasn't even thinking about what I was saying." Ms. Holmes said that the vehicle the defendant had been driving was actually her car and that she spoke with a female officer and asked, "'Well, can you get his keys and his phone and stuff so I can get his car?'" She said that the officer agreed but that as "she was about to give them to me," another officer "stopped her and told her, no, that they were going to seize the car." She noted that "there was a lot of people standing outside being nosey. 'Cause anytime people see the police, they going to come outside and be nosey." Among the bystanders were Ms. Holmes' "daughter, my boyfriend at the time, [the defendant's] girlfriend, my grandson, a bunch of people." She also said that several neighbors were also "outside being nosey."

During cross-examination, Ms. Holmes said that it was her routine to go to her daughter's house after work and that on the day of the defendant's arrest, she saw his car stopped by the police while en route to her daughter's house. She said that the defendant's arrest "was already in process when I got there." She also saw her daughter and grandson standing outside. She explained that she owned the car but that the defendant "was driving the car[,] . . . . [s]o it was his car at the time." She said the car was registered to the defendant's girlfriend, who arrived at the scene sometime after Ms. Holmes arrived. Ms. Holmes denied that the defendant had called and asked her to come to the scene. She said that she asked the officers to give her the defendant's telephone, keys, and car because she "was going to take the car with me." She reiterated that an officer told her that "he was seizing the car." She stayed at the scene until the car was towed away.

On redirect examination, Ms. Holmes estimated that five to six other people that she knew saw her at the scene.

Kristin Brown, the defendant's fiancé, testified that she arrived at the scene "at the end" of the incident. She said that Ms. Holmes was already present when she arrived and that the defendant was already in the police vehicle. She asked Ms. Holmes what was going on, and Ms. Holmes said, "'Well, they won't let me get my son's car.'" Ms. Brown said that she came to the scene because the defendant's sister had called her.

During cross-examination, Ms. Brown said that she and the defendant shared the car and that she thought that it was registered in the defendant's name. She said that she attempted to recover the car after it had been towed but that "the company who had it,

-10-

. . . told me that it was seized, that I couldn't get it."

At the close of the evidence, the trial court took the matter under advisement. In its written order denying the defendant's motion to suppress the evidence found in the warrantless search of the car, the trial court found that Officer Akins effectuated a traffic stop on the defendant after members of the task force saw Mr. King in the passenger's seat of the defendant's vehicle. The court also found that the officers had already seized the vehicle and begun to search it before Ms. Holmes arrived on the scene and asked to take possession of it and that Ms. Brown did not arrive at the scene until after Ms. Holmes. The trial court concluded that the initial traffic stop and the defendant's arrest were lawful. The trial court concluded that the search of the vehicle was not lawful as a search incident to an arrest because the defendant was secured in a police vehicle at the time of the search. The court, however, concluded that the search was a valid inventory search. The court found that because the vehicle was parked in the middle of the road, the defendant had been arrested, and neither Ms. Holmes nor Ms. Brown were present when the officers decided to impound the vehicle, the officers properly impounded the vehicle and that the inventory search was permissible.

In this appeal, the parties do not dispute that the initial traffic stop or the defendant's arrest were lawful; they dispute only the propriety of the impoundment and search of the defendant's vehicle. The defendant argues that the evidence collected during the search of his vehicle was inadmissible because the officers illegally impounded the vehicle despite his asking them to allow his mother to take possession of the vehicle. The State argues that an inventory search was permissible because the officers properly impounded the vehicle.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). Our supreme court has recognized, as one exception to the warrant requirement, that "it is constitutionally permissible for police officers to inventory the contents of a

lawfully impounded automobile without a search warrant as long as it is in accordance with routine administrative procedures." *State v. Watkins*, 827 S.W.2d 293, 295 (Tenn. 1992) (citing *South Dakota v. Opperman*, 428 U.S. 364, 373 (Tenn. 1976)).

Impoundment of a vehicle is not permissible in every case, however. As our supreme court has said, "Impoundment of a citizen's vehicle following his or her arrest on a traffic charge is inappropriate when reasonable alternatives to impoundment exist." *Drinkard v. State*, 584 S.W.2d 650, 653 (Tenn. 1979) (quoting *State v. Bales*, 552 P.2d 688, 689 (Wash. 1976)). The lawful arrest of a driver, alone, is insufficient to support a vehicle's impoundment; "there must also be reasonable cause to take his vehicle into custody." *Id.* "The guideline . . . is that if the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. *Id.* "[T]he overriding question is whether, under all the attendant circumstances, impoundment is reasonably necessary." *State v. Lunsford*, 655 S.W.2d 921, 923 (Tenn. 1983) (citing *Drinkard*, 584 S.W.2d at 654; *Miller v. State*, 504 So. 2d 1307 (Fla. 1981)). The State bears the burden to "show the reasonableness of the impoundment." *Drinkard*, 584 S.W.2d at 654 (quoting *Bales*, 552 P.2d at 689).

In determining the reasonableness of the impoundment, the trial court should consider the extent to which the officer advised the defendant "that his car will be impounded unless he can provide a reasonable alternative to impoundment." *Lunsford*, 655 S.W.2d at 924 (citation omitted). An officer's "failure to ask the defendant if he had an alternative to towing the vehicle," however, does not invalidate an impoundment when "there are no reasonable alternatives for the disposition of the car." *Jason Lee Fisher v. State*, No. M2014-02327-CCA-R3-PC, 2015 WL 5766521, at *5 (Tenn. Crim. App., Nashville, Oct. 2, 2015) (quoting *State v. Jeffery L. Hammons*, No. M1999-00756-CCA-R3-CD, 2000 WL 924633, at *3 (Tenn. Crim. App., Nashville, June 30, 2000)).

Here, the trial court found that the defendant's vehicle was stopped in the middle of the road and that neither Ms. Holmes nor Ms. Brown arrived until after the vehicle had been impounded and the search of the vehicle had begun. The record supports these findings. Because no eligible driver was available to take possession of the car when Officer Akins decided to impound the vehicle and have it towed from the scene, the impounding of the vehicle was appropriate. *See Jason Lee Fisher*, 2015 WL 5766521, at *5 (quoting *Jeffrey L. Hammons*, 2000 WL 924633, at *3) ("[T]his court has held that '[w]here there are no reasonable alternatives for the disposition of the car, the appropriate action is to impound the vehicle.'" (second alteration in *Fisher*)). Consequently, the inventory search of the vehicle was lawful, and the results of the search are not subject to

-12-

suppression.  That Ms. Holmes and Ms. Brown arrived after the search of the vehicle had commenced did not invalidate the impoundment.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE